UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
STEPHEN D. NELSON,

                              Plaintiff,                    **MEMORANDUM AND ORDER**
                                                                 14-CV-2874 (RRM)
            -against-

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Stephen D. Nelson brings this action against the Commissioner of Social

Security ("the Commissioner") pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of

the Commissioner's determination that he was not disabled and, therefore, not eligible for

Supplemental Security Income ("SSI").  Plaintiff and the Commissioner now cross-move for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For

the reasons set forth below, the Commissioner's motion is denied, and plaintiff's motion is

granted to the extent that it requests that this matter be remanded to the Commissioner for further

proceedings.

## BACKGROUND

      Except as otherwise indicated, the following facts are drawn from the Administrative

Record and are not in dispute.  Plaintiff was born in late December 1971.  (117.)[1]  He dropped

out of high school in 1987 after completing the 11th grade.  (134.)  Although he earned almost

$500 in 1986, Social Security records indicate that he earned virtually no money in 1987 and no

money whatsoever in 1988.  (127.)

---

[1] Numbers in parentheses denote pages in the Administrative Record (Doc. No. 19).

Sometime in early 1988, plaintiff was incarcerated.  On March 19, 2005, after 17 years and two months in prison, plaintiff was released from custody. (150.)  He moved back into his parents' apartment in Crown Heights, Brooklyn, where he remained at the time this action was filed.  (56, 118, 132.)  In April 2005, he was employed full-time in a metal shop, painting and finishing metal grilles.  (161.)  That job required standing, stooping, and crouching throughout the 8-hour workday.  (161.)  It also required frequently lifting objects weighing 10 pounds and occasionally lifting objects weighing 20 pounds.  (161.)

Over the next two years, plaintiff visited a Dr. Marc Alerte on at least five occasions.  The first of these visits occurred in early July 2005 after plaintiff, who had a history of asthma dating back to childhood, caught cold.  (253.)  Plaintiff complained of coughing, wheezing, and tightness in the chest and told the doctor that he had had the cold for three days.  (253.)  The doctor prescribed Amoxicillin, an antibiotic, and an inhaler and directed plaintiff to follow up on October 7, 2005.  (252.)  By that date, plaintiff was asymptomatic.  (255.)

In late January 2006, plaintiff caught cold again.  After four days, he visited Dr. Alerte, complaining of nasal congestion and a boil on the right side of his face.  (254.)  The doctor prescribed various medications and scheduled another appointment for early April 2007.  (254.)

By July 2006, the work at the metal shop was "affecting [plaintiff's] breathing."  (160–61.)  That month, he changed jobs and began working four days a week as a laborer for a moving company.  (160, 162.)  That job required plaintiff to walk, stand, stoop, and crouch all day, and to frequently lift 20 pounds.  (162.)  It also required plaintiff to lift 100 pounds or more on occasion.  (162.)

When plaintiff returned to Dr. Alerte on April 4, 2007, he was largely asymptomatic.  (257.)  However, he had an ingrown toenail on the left great toe.  (257.)  Although the doctor's

notes state that plaintiff was scheduled to have surgery at Interfaith Medical Center ("Interfaith") on May 18, 2007, (257), it is unclear whether that was podiatric surgery or some other type of operation.  Plaintiff was scheduled for a follow up appointment on June 2, 2007.  (257.)

Although the Administrative Transcript contains records from Interfaith, those records do not indicate that a surgical procedure took place in May 2007.  Rather, the records indicate that plaintiff visited the Interfaith Emergency Department at 11:00 p.m. on May 14, 2007, complaining of an ingrown toe nail on the left foot and a blood clot in his legs.  (203.)  Plaintiff stated that the intermittent pain in his toe had developed gradually over the preceding three days and he estimated its intensity as level 8 on a scale of 1 to 10. (203.)  There is no indication that plaintiff was diagnosed with a blood clot, though the records contain the results of various blood tests, (205–17), and mention cellulitis, a type of bacterial skin infection, (200–02).  Plaintiff was ultimately discharged on the afternoon of May 15, 2007, without a diagnosis.  (200–02.)

On June 2, 2007, plaintiff returned to Dr. Alerte, complaining that he had been wheezing and coughing for a day.  (256.)  The doctor attributed the symptoms to asthma and allergies and prescribed both Proventil and Advair inhalers, both of which are bronchodilators.  (256.)

At the end of June 2007, plaintiff stopped working at the moving company.  (133–34, 161.)  Although his application for SSI benefits implied that he quit because of severe asthma, lower back pain, and a stomach acid problem, (133), Dr. Alerte's records do not indicate that plaintiff complained of the stomach acid problem or back pain prior June 30, 2007, and indicate that plaintiff did not visit Dr. Alerte for more than three years after that date.  At a hearing before the ALJ in October 2012, plaintiff admitted that he had been laid off due to a "lack of work." (57.)

The first mention of back pain in the Administrative Record is contained in records of plaintiff's visit to the Interfaith Emergency Department on the evening of December 17, 2008, when he complained of pain in his big toe and lower back.  (195–96.)  Plaintiff said he began experiencing the back pain the previous day after lifting a heavy object, and described it as a sharp, non-radiating pain with an intensity level of 8 on a scale of 1 to 10.  (196, 199.)  In contrast, he described the toe pain, which had persisted for two days, as a throbbing pain around the nail bed with an intensity level of 10.  (196, 199.)  Plaintiff was prescribed Keflex, an antibiotic; Robaxin, a muscle relaxant; and 600 milligram tablets of Motrin, a non-steroidal anti-inflammatory drug before being discharged approximately two hours after he entered the Emergency Room.  (196–97.)

The Administrative Record does not contain any medical records for 2009 or most of 2010.  Indeed, according to the Administrative Record, plaintiff's next contact with medical professionals occurred on October 26, 2010, when he went to the Emergency Department at Kingsbrook Jewish Medical Center ("Kingsbrook").  (226.)  There, he told medical personnel that he had been diagnosed with asthma at age 12, that he suffered asthma attacks four to five times a year, and that he had been intubated multiple times, most recently four weeks prior to his hospital visit.  (225–26.)  These claims are not substantiated by the Administrative Record.

When examined at Kingsbrook, plaintiff exhibited few symptoms.  He had a "cough with scanty phlegm," but no wheezing, rales, or rhonchi.  (226.)  Medical personnel noted that he had "good air exchange" in both lungs but his peak flow was only 230, which was low for someone of plaintiff's age and height.  (225–26.)  However, the records state that plaintiff used "fair respiratory effort," and subsequently refused to use the peak flow meter again.  (225–26.)  The hospital discharged plaintiff after about four hours in the Emergency Room and advised him to

4

follow up with his primary care doctor as soon as possible.  (221.)  There is no indication in the Administrative Record that plaintiff followed that advice.

On November 5, 2010, plaintiff returned to Kingsbrook's Emergency Department with a dental problem.  He no longer had a cough and had no asthma-related complaints.  (233.)  An examination of his lungs revealed no abnormalities:  no wheezing, rales, or rhonchi and "good air exchange" in both lungs.  (233.)

Plaintiff returned to Dr. Alerte's office for a checkup on November 17, 2010.  (258.)  At that visit, plaintiff was diagnosed with asthma, allergies, and – for the first time – dyspepsia. (258.)  Plaintiff was prescribed various medicines for his respiratory problems:  a Ventolin inhaler; Advair Diskus, a bronchodilator; and Singular, a leukotriene inhibitor.  (258.)  He was also prescribed Nexium, a proton pump inhibitor that decreases the production of stomach acid, for the dyspepsia. (258.)

Plaintiff appeared for a scheduled follow-up appointment on December 16, 2010. According to Dr. Alerte's notes for that visit, plaintiff appeared "well" and "in no distress." (260.)  Plaintiff remained in no distress when he returned to the doctor's office for a checkup in mid-March 2011.  (260.)  Plaintiff was continued on the prescriptions.  (260.)  He was scheduled for a follow-up appointment on May 9, 2011.  (260.)

At the May 9 appointment, plaintiff complained of redness in eyes and secretions over the previous three days.  (263.)  The doctor diagnosed acute conjunctivitis and prescribed medications.  (263.)  The doctor's examination also revealed mild wheezing in the lungs but no other maladies.  (263.)

Plaintiff next visited Dr. Alerte on July 6, 2011, after catching a cold.  (262.)  Plaintiff complained of coughing and nasal congestion but did not claim to be short of breath.  (262.)  On

examination, the doctor noted that plaintiff's lungs were clear and made no notations of stomach or back problems. (260.)

The SSI Application

On July 25, 2011, plaintiff applied for Supplemental Security Income under XVI of the Social Security Act, alleging that he had been disabled since July 30, 2007. (117.) He claimed that he was suffering from severe asthma, a stomach acid problem, and a lower back problem, and that he had stopped working because of these conditions. (133.) His application listed the three health care providers whose records are described above: Dr. Alerte, Interfaith, and Kingsbrook. (136–38.) However, it also referenced emergency room visits for which the Administrative Record contains no documentation. First, it alleged that plaintiff had visited Interfaith in December 2010 for severe asthma and a lower back problem, for which he had received X-rays. (137.) Second, the application indicated that plaintiff had been treated at Kingsbrook for severe asthma in 2011. (138.)

Two days later, plaintiff visited Dr. Alerte for a cold. (279.) In addition to complaining of coughing and nasal congestion, plaintiff complained of lower back pain. (279.) This appears to be the first time plaintiff had complained to Dr. Alerte of back pain. There is no evidence that the doctor ordered any tests or took any other actions in response to this complaint.

On August 6, 2011, plaintiff completed a function report in connection with his SSI Application. (148–59.) That document stated that plaintiff was not limited in his ability to sit or kneel, but had difficulty climbing stairs or crouching. (154.) The document also stated that plaintiff was not in pain or receiving treatment for pain. (156.) However, it alluded to mental problems, stating that plaintiff had difficulty paying attention because he was depressed, that he

had trouble remembering things because he "use[d] to smoke a lot of weed," and that he did not handle stress or changes in scheduled "too well." (155–56.)

Plaintiff's function report asserted that his breathing problem, which was worst in winter, prevented him for working either inside or outside. (148.) He also claimed that his breathing prevented him from lifting anything heavy, (153), and that he need help taking his clothes to the laundromat. (151.) Although he swept and mopped every morning, (151), he asserted that poor circulation in his right leg prevented him from standing too long, (148, 153), and that he could only walk a block before having to stop and rest for about 10 minutes. (155.) However, he also reported walking daily for exercise, (149), and using a brace if he was "walking for a long time," (155). In addition, although he lived at home with his mother, he claimed that he went shopping for food, clothes, and music in stores and that these shopping trips lasted two hours. (152.)

Plaintiff's SSI application was assigned to an Examiner Schwartz, who promptly acted to obtain the relevant medical records from Dr. Alerte, Interfaith, and Kingsbrook. He also referred plaintiff for a consultative medical examination with Dr. Aurelio Salon, an internist employed by Industrial Medical Associates, P.C. Although the Administrative Record suggest that Schwartz received the records from Interfaith on August 12, 2011, and the records from Kingsbrook on August 17, 2011, it is unclear whether these records were provided to Dr. Salon prior to the doctor's September 14, 2011, examination.

Around 7:30 a.m. on August 26, 2011, plaintiff visited Kingsbrook's Emergency Room, stating that he was experiencing shortness of breath that had worsened over the preceding two days. (240.) According to the notes relating to this visit, plaintiff had also visited the hospital the previous day, where he had been given an X-ray and a dose of prednisone, a corticosteroid used to reduce swelling. (240.) He had also been given a prescription for oral steroids which he

had not yet filled.  (240.)  However, the Administrative Record does not contain any records of the August 25 visit.

A physical examination of plaintiff revealed "marked expiratory wheezing" and a "moderate cough productive of whitish sputum."  (239.)  He also had high blood pressure on the three occasions that it was measured that morning, (237), though he had no history of hypertension, (239.)  An X-ray, which was correlated with the one taken the previous day, revealed no evidence of acute pulmonary disease.  (236.)  Plaintiff was diagnosed with Asthma with Status Asthmaticus – an asthma attack that does not respond to standard treatments such as inhaled bronchodilators and corticosteroids.  (236.)  The records suggest that he was admitted to the hospital, (237, 240), though the Administrative Record contains no records of this – or any other – hospitalization.

On September 14, 2011 – about three weeks prior to the visit to Kingsbrook – plaintiff was examined by Dr. Salon.  (244.)  The doctor took a history, which focused largely on plaintiff's respiratory problems.  According to the doctor's report, plaintiff said had been diagnosed with bronchial asthma as a child and that he had two or three asthma attacks a month. (244.)  These allegedly resulted in "several hospitalizations" and an intubation five years earlier. (244.)  The Administrative Record contains no evidence of these hospitalization or of any intubations.

Plaintiff also complained of several other medical problems.  First, he complained that he had developed lower back pain in 1998 or 1999.  He claimed that he had an X-ray and MRI, and was subsequently "told that he had just a muscle sprain."  (244.)  He recalled having physical therapy in 2000, but none since then.  (244.)  The Administrative Record contains no evidence of the radiological tests or the physical therapy.  (244.)

Second, plaintiff stated that he had surgery to repair an inguinal hernia in June 2007 and that he had been told that he had "increased acid in his stomach." (244.)  However, he stated that he was not taking any medication for this problem. (244.)  Third, plaintiff claimed that he had told during his recent hospitalization that he had hypertension, but that he was not placed on any medication. (244.)

On physical examination, Dr. Salon noted a right inguinal scar, (246), but no significant abnormalities.  Notably, Dr. Salon found no abnormalities in the chest and lungs and a full range of motion in the lumbar spine. (246.)  An X-ray of the lumbosacral spine taken on the date of the examination revealed degenerative disk disease at L4-L5 and a transitional L5 vertebral body. (248.)  However, Dr. Salon concluded that there were "no objective findings to support the fact that claimant will be restricted in his ability to sit or stand or in his capacity to climb, push, pull, or carry heavy objects." (247.)  In light of plaintiff's history of bronchial asthma, the doctor recommended that plaintiff "avoid smoke, dust, or other known respiratory irritants." (247.)

By letter dated October 14, 2011, the Social Security Administration ("SSA") notified plaintiff that his application for SSI was denied. (75–79.)  That notice attached an "Explanation of Determination" form ("the Explanation") which stated that the state agency which made the determination had only Dr. Salon's report and a "report" from Kingsbrook dated October 13, 2011. (79.)  Although the Administrative Record suggest that Kingsbrook supplied records of plaintiff's August 26, 2011, Emergency Room visit to the SSA on October 12, 2011, (234–43), the Administrative Record does not contain a report from Kingsbrook dated October 13, 2011. In addition, although the Administrative Record suggests that Interfaith and Kingsbrook provided other records in August 2011, the Explanation makes no mention of these records.

The Explanation acknowledged that the medical reports showed a history of asthma attacks and pain and stiffness which resulted in "some restriction of … activities." (79.) However, it opined that these reports "did not show any condition of a nature that would prevent [plaintiff] from working." (79.) Specifically, the Explanation stated:

> We realize that at present you are unable to perform certain kinds of work. But based on your age of 29 years, your education of 11 years, and your experience, you can perform light work (for example, you could lift a maximum or 20 lbs., with frequent lifting or carrying of objects weighing up to 10 lbs., or walk or stand for much of the working day.

(79.) The only document substantiating these assessments, however, was a "Physical Residual Functional Capacity Assessment" completed by Examiner Schwartz. (69–74.)

Plaintiff timely requested a hearing before an Administrative Law Judge, complaining that the state agency had not conducted a full investigation into his medical history or obtained records from his physician. (81.) In January 2012, plaintiff hired a lawyer, Martin R. Sobel. (83–84.)

In the 12 months between November 2011 and October 2012, plaintiff visited Dr. Alerte seven times. On November 7, 2011, plaintiff went for a checkup. (280.) Although he was well and in no distress, he complained of stomach difficulties. (280.) The doctor prescribed Prilosec, a proton pump inhibitor which reduces stomach acid production, and renewed plaintiff's prescription for a Ventolin inhaler. (280.)

On December 14, 2011, plaintiff returned to the doctor, complaining of a toenail infection. (281.) Dr. Alerte referred him to a podiatrist. (281.) The Administrative Record does not contain anything to suggest that plaintiff ever visited the podiatrist.

On January 18, 2012, plaintiff went to Dr. Alerte complaining of back pain and cold symptoms. (282.) The doctor noted nasal congesting and recommended Sudafed.

(282.)  Plaintiff also complained of cold symptoms at his next visit on March 7, 2012.

(283.)  The doctor noted coughing a wheezing and recommended Robitussin.  (283.)

Plaintiff returned to Dr. Alerte on April 26, 2012, this time complaining of back pain and pain and swelling in the right leg.  (284.)  Plaintiff was advised to continue Naproxen, a nonsteroidal anti-inflammatory drug which plaintiff had already been prescribed.  (284.)  Plaintiff was apparently still experiencing back pain when he went to the doctor again on September 12, 2012, after catching another cold.  (285.)  This time, Dr. Alerte sent him for an X-ray.  (285.)

That X-ray, taken September 17, 2012, revealed several abnormalities.  There was a severe loss of disc space height at L5-S1 with vacuum phenomenon – *i.e.*, gas formation in the disc space.  (286.)  In addition, there was endplate sclerosis – *i.e.*, advanced degeneration of the cartilage and porous bone located between the vertebrae and intervertebral discs – at L5-S1.  (286.)  There was also facet sclerosis – degeneration of the facet joints – at L4-L5 and L5-S1.  (286.)

On October 11, 2012, plaintiff appeared at a hearing before ALJ Michael Friedman, accompanied by Mr. Sobel.  Before plaintiff testified, his attorney raised several challenges to the state agency's determination.  Mr. Sobel noted that the examiner's decision was based on Dr. Salon's report, which did not address all of plaintiff's limitations and was "very vague."  (51–52.)  The attorney questioned the consultative examiner's qualifications to issue an opinion, noting that he was an internist and not an orthopedist, and implied that the doctor may not have been furnished with all relevant medical records.  (50, 52.)  Noting that there were X-rays showing that plaintiff had an orthopedic problem, Mr. Sobel asked the ALJ to order an orthopedic consultative

examination.  (50, 52.)  He also stated that he was seeking a medical source statement

from Dr. Alerte, prompting that ALJ to say that he would "hold the record open for [that]

… statement."  (52–53, 56.)

Plaintiff then testified about his medical conditions.  He testified that he had pain

in his lower back and right leg, which was moderated only "slightly" by medication.

(57–58.)  He stated that he had a back brace, which he did not wear to the hearing, and

that he had never received physical therapy or an MRI.  (58, 64.)  He experienced

swelling in the right leg occasionally, which caused him "a little bit of pain," but took

pain pills which made him feel "a little better" when the swelling occurred. (60.)

Although he thought the leg pain might be related to the back pain, he also noted that he

had cellulitis and a blood clot in that same leg.  (60.)

In addition to these orthopedic issues, plaintiff mentioned three other conditions.

First, he testified that he had asthma, claiming that he had been hospitalized a number of

times for this condition.  (59, 64.)  He stated that he was taking Albuterol, which helped

his breathing, and Singulair.  (59.)  Second, he implied that he had a drinking problem,

testifying that he drank five cans of beer every day and once consumed three six-packs in

a day.  (62–63.)  Although plaintiff denied that his doctor ever expressed concern about

his alcohol consumption, (63), Dr. Alerte's records do not indicate that plaintiff ever

spoke to the doctor about this problem.  (152.)  Third, plaintiff claimed he was suffering

from depression, and that Dr. Alerte was going to refer him to a psychiatrist.  (63.)  He

claimed he was going to receive that referral when he went to see Dr. Alerte the

following day, (64), but Administrative Record does not contain a record of this doctor's

visit.

Plaintiff also offered testimony regarding his residual functional capacity.  He claimed that he could stand for only 15 minutes at a time, could walk only 3 blocks without stopping, and could sit for at most 20–25 minutes.  (61.)  However, he testified that he had taken the subway from the Crown Heights, Brooklyn, apartment he shared with his parents to the hearing at 26 Federal Plaza in Manhattan.  (61.)  He also testified that he could only lift 5–7 pounds.  (61.)  He testified that he last worked for "about 40-something days" putting addresses on envelopes and had been laid off from his previous job as a laborer for a moving company in 2007.  (56–57.)

On November 14, 2012, Mr. Sobel wrote a letter to ALJ Friedman, stating that plaintiff had begun psychiatric treatment at Interborough Developmental and Consulting Center ("Interborough") in Brooklyn.  (184.)  The letter represented that plaintiff underwent intake in late October 2012; had therapy sessions on November 5 and 12, 2012; and had an appointment with a psychiatrist in early December 2012.  (184.)  The attorney urged the ALJ to subpoena the records and to send plaintiff to SSA consultants for psychiatric and orthopedic examinations.  (184.)  In addition, Mr. Sobel asked for an additional 15 days in which to obtain a Medical Source Statement from Dr. Alerte.  (184.)

The ALJ never ordered consultative examinations, though he did delay ruling on plaintiff's case for over a month.  There is no evidence that the ALJ ever subpoenaed the Interborough records or tried to obtain the medical source statement from Dr. Alerte.

The ALJ's Decision

On December 17, 2012, the ALJ issued a decision finding that plaintiff was not disabled as defined in § 1614(a)(3)(A) of the Social Security Act and denied his application for SSI. (22–27.)  In reaching this decision, the ALJ followed the five-step sequential evaluation process for

adjudicating Social Security disability claims set forth in 20 CFR § 416.920(a).  At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since July 25, 2011 – the date on which plaintiff applied for SSI benefits.  (24.)  At Step Two, ALJ Friedman determined that plaintiff had two severe medical impairments: degenerative changes of the lumbar spine and asthma.  The decision specifically denied Mr. Sobel's requests that the ALJ subpoena plaintiff's mental health treatment records and order a consultative psychiatric examination.  (24.)  He noted that plaintiff had not asserted a significant mental impairment prior to the hearing and that the Administrative Record contained "no substantial evidence of any longitudinal mental impairment," making it "doubtful" that plaintiff could "establish a 'severe' mental disorder that meets the 12-month duration requirement."  (24.)

At Step Three, the determined that the impairments, alone or in combination, did not meet or equal one of the impairments listed in 20 CFR Part 404, Subpart B, Appendix 1.  (24.)  At step four, the ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR § 416.967(b), except for work requiring more than moderate exposure to respiratory irritants or poor ventilation.  (25.)  The ALJ asserted that his assessment of plaintiff's RFC was "supported by the examination findings and opinions of Dr. Salon …, as well as the claimant's activities of daily living."  (25.)  The ALJ acknowledged that plaintiff had medically determinable impairments that could be expected to cause the symptoms plaintiff alleged, but held that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were incredible to the extent that they were inconsistent with his RFC assessment.  (25.)  Thus, the ALJ did not credit plaintiff's claim that he could stand for only 15 minutes at a time, sit for only 25 minutes, walk only 3 blocks, and lift only 5–7 pounds. (25.)

After determining that plaintiff did not have the RFC to perform his past relevant work, (26), the ALJ turned to the Medical-Vocational Guidelines set forth in 20 CFR Part 404, Subpart B, Appendix 2. The ALJ noted that plaintiff, who was almost 41 in December 2012, was a "younger individual" as defined in 20 CFR § 416.963(c), and was able to communicate in English. (26.) Having completed the 11th grade, plaintiff had only a "limited education" as defined in 20 CFR § 416.964(b)(3), and had only performed "unskilled work," as defined in 20 CFR § 416.968(a). (26.) However, in light of the ALJ's assessment of plaintiff's RFC, medical-vocational rule 202.17 dictated that a person of plaintiff's age, education, and work experience be found to be "not disabled." (27.)

The Appeal

Mr. Sobel timely appealed ALJ Friedman's unfavorable decision to the Appeals Council. (12-14.) In support of that appeal, Mr. Sobel provided the Appeals Council with some additional medical and psychiatric records, (6–9, 15–17, 288–97), and a brief dated March 25, 2013, (189–93).

One of the psychiatric records – a Psychiatric Evaluation conducted by Dr. Joseph Voight, a psychiatrist, at Interborough on December 3, 2012 – predated the ALJ's decision by two weeks. That document indicates that plaintiff reported feeling depressed for the past two months, and experiencing associated symptoms such as insomnia, anhedonia, decreased energy, and headaches. (289.) Although he denied suicidal ideation and a history of psychiatric treatment, he reported feeling depressed while incarcerated and slashing his right arm in 1988. (289.) He also reported occasionally experiencing anxiety attacks occasionally and drinking beer four or five times a week. (289.) Dr. Voight diagnosed with alcohol dependence and depressive and anxiety disorders, not otherwise specified. (291.) He assessed plaintiff's Global Assessment

15

of Functioning ("GAF") score at 50 – which connotes serious impairment in social, occupational, or school functioning – and prescribed an antidepressant, Remeron (Mirtazapine).  (291.)  The doctor also theorized that plaintiff might have an antisocial personality disorder.  (291.)

Mr. Sobel also provided the Appeals Council with medical records that postdated the ALJ's decision.  First, the attorney provided Psychiatric Progress Notes dated December 27, 2012, and three dates in early 2013.  (294–97.)  Second, he supplied evidence that plaintiff returned to Kingsbrook's Emergency Room on February 14, 2013, after suffering an asthma attack.  (6.)  The Appeals Council acknowledged receiving this evidence, but held that that everything other than the December 27, 2012, Progress Note related to plaintiff's condition after December 17, 2012, and was therefore irrelevant to the question of whether the plaintiff was disabled at the time of the ALJ's decision.[2]

Mr. Sobel also sent the Appeals Council a five-page brief dated March 25, 2013, (189–93), which the Appeals Council made part of the record.  (5.)  That brief raised several points, some of which are discussed in more detail below.  First, Mr. Sobel argued that the ALJ failed to complete the documentary record by, among other things, failing to make any attempt to obtain plaintiff's psychiatric records from Interborough.  (190).  Second, plaintiff's counsel argued that Dr. Salon's Medical Source Statement was incomplete and that the ALJ did not offer any analysis of the records of the treating physician, Dr. Alerte.  (190.)  Third, Mr. Sobel noted that the ALJ did not perform the function-by-function assessment of plaintiff's RFC, as required by SSR 96-8p.  (189.)  Finally, he argued that because plaintiff had a nonexertional limitation – namely, the need to avoid smoke, dust, and other respiratory irritants – the ALJ should not have

---

[2] The Appeals Council included the psychiatric records from December 3 and 27, 2012, in the record.  (5.)  However, the only entry on the Psychiatric Progress Note for December 27, 2012 – aside from plaintiff's name, the date, and the doctor's signature – is the word "Broken."  (294.)  The Court assumes that plaintiff failed to appear for these appointments.

relied exclusively on the Medical-Vocational Guidelines at Step Five of his analysis but should have consulted a vocational expert.  (191.)

On March 7, 2014, the Appeals Counsel denied plaintiff's request for review of the ALJ's decision, making that decision the final determination of the Commissioner.  (1–4.)  This action ensued.

## STANDARD OF REVIEW

A final determination of the Commissioner upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g).  *See* 42 U.S.C. § 1383(c)(3).  Section 405(g) gives a district court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, a court's review under § 405(g) is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"Substantial evidence" connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the [Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn."  *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).  The "substantial evidence" test applies only to the

17

Commissioner's factual determinations.  Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

<u>Eligibility for SSI</u>

To be eligible for SSI, an individual must be blind, aged, or disabled and fall within certain income and resource limits.  *See* 42 U.S.C. §§ 1381, 1382(a).  An adult is "considered to be disabled ... if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* § 1382c(a)(3)(A).  The physical or mental impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." *Id.* § 1382c(a)(3)(B).  The term, "work which exists in the national economy," is defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step framework set forth in 20 CFR § 416.920(a)(4). "The claimant has the general burden of proving that he or she has a disability within the meaning of the [Social Security] Act and bears the burden of proving his or her case at steps one through four of the sequential five-step framework." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations and quotations omitted). At Step Five, however, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (quoting *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012)).

## DISCUSSION

### A.  Failure to Develop the Record

"Even when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants ... affirmatively develop the record ....'" *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Lamay*, 562 F.3d at 508–09).  This duty arises from the facts that "Social Security disability determinations are 'investigatory, or inquisitorial, rather than adversarial.'" *Id.* (quoting *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004)).  Thus, "it is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Butts*, 388 F.3d at 386 (citation omitted).

Pursuant to this duty, ALJs are bound to "make every reasonable effort" to help claimants obtain evidence from their treating physicians and other medical providers and to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant applied for benefits] unless there is a reason to believe that development of an

earlier period is necessary." 20 C.F.R. § 404.1512(b)(1); accord 42 U.S.C. § 423(d)(5)(B)

(requiring the Commissioner to "make every reasonable effort to obtain from the individual's

treating physician (or other treating health care provider) all medical evidence, including

diagnostic tests"); *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–83 (2d Cir. 2009).  As

defined in the regulations, "every reasonable effort," entails making an initial request and at least

one follow-up request to providers.  20 C.F.R. § 404.1512(b)(1)(i).  If documents received from

treating sources are unclear or inconsistent, the ALJ may be obligated to follow up by requesting

"supporting documentation or [obtaining] additional explanations."  *Nusraty v. Colvin*, 213 F.

Supp. 3d 425, 442 (E.D.N.Y. 2016); *cf. Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.

1998) (holding there was "a serious question" as to whether the ALJ satisfied his duty after

failing to seek clarification from a treating physician regarding inconsistencies in his reports).

In this case, plaintiff informed the ALJ at the October 11, 2012, hearing that he was

depressed and that Dr. Alerte was referring him to a psychiatrist.  (63.)  On November 14, 2012,

Mr. Sobel wrote a letter to the ALJ, stating that plaintiff had begun psychiatric treatment at

Interborough in late October 2012.  (184.)  Although the letter urged the ALJ to subpoena the

records and to send plaintiff to SSA consultants for a psychiatric examination, (184), the ALJ

took no action.

In his decision, the ALJ attempted to justify his decision not to develop the psychiatric

record.  Specifically, he stated that the Administrative Record contained "no substantial evidence

of any longitudinal mental impairment," and reasoned that it was therefore "doubtful" that

plaintiff could "establish a 'severe' mental disorder that meets the 12-month duration

requirement."  (24.)  However, the ALJ ignored the fact that plaintiff had mentioned his

depression in his Function Report, which was completed 14 months prior to the hearing.  (155,

20

159.)  Moreover, had the ALJ subpoenaed the records from Interborough, he would have discovered that plaintiff alleged that he had slashed his right arm in 1988, received psychiatric examinations while incarcerated, and was regularly experiencing panic attacks.  (289.)  These facts suggested that plaintiff had a history of mental impairments dating from at least 1988, and completely undercut the ALJ's baseless assumption that plaintiff could not establish a mental impairment of more than 12-months duration.

B.   Failure to Seek a Medical Source Statement from Dr. Alerte

In addition to failing to develop the psychiatric record, the ALJ failed to make any effort to obtain a medical source statement from plaintiff's treating physician, Dr. Alerte.  Social Security regulations require the Commissioner to "'request a medical source statement' containing an opinion regarding the claimant's residual capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6).  The Second Circuit has recognized that these regulations "seem[ ] to impose on the ALJ a duty to solicit such medical opinions." *Id.*  The fact that a claimant "had an attorney during the hearing process, and that he submitted evidence from medical sources (but not opinion evidence)[,] … may explain the absence of a request, [but] it cannot excuse it." *Id.*

To be sure, "it is not per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Angelica M. v. Saul*, No. 20-CV-727 (JCH), 2021 WL 2947679, at *5 (D. Conn. July 14, 2021).  The Second Circuit has read the Social Security regulations as suggesting that "remand is not always required when an ALJ fails in his duty to request opinions, particularly where …  the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi*, 521 F. App'x at 33.  However, remand may be necessary when "the medical records obtained by

21

the ALJ do not shed any light on … residual functional capacity, and the consulting doctors did not personally evaluate" the claimant. *Guillen v. Berryhill*, 697 F. App'x 107, 108–09 (2d Cir. 2017) (summary order).  For example, if a claimant's "medical records discuss her illnesses and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life," it is appropriate to remand the matter to the Commissioner with directions to, among other things, "request a medical source statement from [the claimant's] treating physician." *Id.* at 109.

In this case, Mr. Sobel told the ALJ at the hearing that he was going to seek a medical source statement from Dr. Alerte, plaintiff's longtime treating physician, but did not know if he would be able to obtain one.  (52–53.)  It is unclear whether the ALJ himself made any effort to obtain the medical source statement.  However, the Administrative Record contains no subpoenas or other orders addressed Dr. Alerte and no medical source statement from plaintiff's treating physician.

The record does obtain some medical records of plaintiff's visits to Dr. Alerte, but these records are largely illegible.  Furthermore, the legible portions do nothing more than describe the complaint that prompted plaintiff's visit and the treatment prescribed by the doctor.  The records offer no insight into how plaintiff's impairments affected his ability to work or to undertake activities of everyday life. *See Guillen*, 697 F. App'x at 109.

Absent an opinion from plaintiff's treating physician, the only opinion regarding how plaintiff's impairments affected his ability to work was contained in Dr. Salon's report. Although Dr. Salon conducted a physical examination of plaintiff, he was an internist, not an orthopedist, and there is no indication that he was furnished with any of plaintiff's medical

records. Indeed, it appears that the only basis the doctor had for assessing plaintiff's limitations were his own observations during the brief examination itself.

As noted in the ALJ's opinion, the doctor observed that plaintiff was in no distress, ambulated normally, had a full range of motion in his spine, and had exhibited no breathing-related abnormalities. However, these observations provided no basis for assessing how long plaintiff could stand, walk, or sit during an 8-hour workday. In addition, they provided no evidence of how much weight plaintiff could lift and carry, either frequently or occasionally, and whether he could push and pull. Dr. Salon's report tacitly admitted this, stating only, "there are no objective findings to support the fact that the claimant will be restricted in his ability to sit or stand or in his ability to climb, push, pull, or carry heavy objects." (247.)

This "medical source statement" was insufficient to permit an assessment of plaintiff's RFC. "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id. Although Examiner Schwartz's Physical RFC Assessment asserted that plaintiff could sit and stand and/or walk for a total of about 6 hours in an 8-hour workday, could occasionally lift and/or carry 20 pounds, could frequently lift and or carry 10 pounds, (70), there was no evidence whatsoever to support these assessments.

C. The Failure to Make a Function-by-Function Assessment

The absence of a medical source statement made it impossible for the ALJ to make the function-by-function assessment of plaintiff's work-related abilities as required by Social Security Ruling ("SSR") 96-8p. "Before an ALJ classifies a claimant's RFC based on exertional

levels of work (i.e., whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), he 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)).  These functions include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors. *See* 20 C.F.R. §§ 404.1545, 416.945.  "Social Security Ruling 96–8p cautions that 'a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions,' which 'could lead to an incorrect use of an exertional category to find that the individual is able to do past relevant work' and 'an erroneous finding that the individual is not disabled.'" *Cichocki*, 729 F.3d at 176 (quoting SSR 96-8p, 1996 WL 374184, at *4).

In this case, the ALJ's decision did not contain a function-by-function assessment. Rather, it principally relied on Dr. Salon's report, asserting that the doctor had concluded that plaintiff had no restrictions in his ability to sit, stand, climb, push, pull, or carry heavy weights. Even if Dr. Salon's report, which stated only that his brief examination of plaintiff's revealed no objective evidence of limitations, supported this assertion, the ALJ's decision did not explain why Dr. Salon's report supported his conclusion that plaintiff was limited to light work.  Since the ALJ's rationale is unclear, it is appropriate to "remand for further findings or a clearer explanation for the decision." *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982).

If the ALJ had performed the function-by-function analysis, he might have also realized that both he and Dr. Salon never assessed plaintiff's ability to walk. "Light work" requires, among other things, the ability to "walk for up to 6 hours a day." *Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) (citing 20 C.F.R. § 404.1567(b) ("light work" requires "a good deal of walking")). Although the Administrative Record contains evidence that plaintiff walked for exercise, (149), and was capable of a two-hour shopping trip, (152), there is no evidence that he was able to walk for 6 hours a day.

### D. Failure to Consider Plaintiff's Nonexertional Limitations

The ALJ also erred in relying exclusively on the Medical-Vocational Guidelines (the "Grids") at Step Five of the sequential analysis. At Step Five, the Commissioner has the burden of showing that other work exists in significant numbers in the national economy that the claimant can do. *See Schillo v. Kijakazi*, 31 F.4th 64, 70 (2d Cir. 2022). "Generally speaking, if a claimant suffers only from exertional impairments, e.g., strength limitations, then the Commissioner may satisfy her burden by resorting to the applicable grids." *Pratts v. Chater*, 94 F.3d 34, 38–39 (2d Cir. 1996). But if a claimant has "nonexertional" impairments that "'significantly limit the range of work permitted by his exertional limitations' then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments." *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (quoting *Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983)). "Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate." *Id.* at 605–06. As used here, the phrase "significantly diminished" means an "additional loss of work capacity beyond a

negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 606.

Difficulty tolerating dust or fumes is a nonexertional limitation. *See* 20 C.F.R. § 404.1569a(c)(1)(v).  In some instances, this nonexertional limitation can significantly diminish a claimant's work capacity.  For example, "[w]here an individual can tolerate very little … dust, … the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions."  Titles II & XVI: Capability to Do Other Work – The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments, SSR 85-15.  However, "[w]here a person has a medical restriction to avoid excessive amounts of … dust, … the impact on the broad world of work would be minimal because most job environments do not involve great … amounts of dust …."  *Id.*  "Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the services of a [vocational expert]."  *Id.*

In this case, Dr. Salon's report stated that plaintiff "should avoid smoke, dust, and other known respiratory irritants."  (AR 247.)  Although this statement was vague, the ALJ himself interpreted it as implying that plaintiff could only tolerate "moderate exposure to respiratory irritants" (AR 25) – *i.e.,* exposure "between very little and excessive."  Accordingly, the ALJ could not simply rely on the grids at Step Five of his analysis, but needed to consult either occupational reference materials or call a vocational expert in order to determine if there were jobs that exist in significant numbers in the national economy that plaintiff could perform.

**CONCLUSION**

For the reasons set forth above, the Court concludes that the ALJ failed to develop the record adequately, to seek a medical source statement from the treating physician, to make a function-by-function assessment of plaintiff's RFC, and to either consult occupational reference materials or call a vocational expert before determining that there were jobs that existed in significant numbers in the national economy that plaintiff could perform.   Since the Administrative Record at present does not dictate a finding of disability, the Court remands this matter to the Commissioner to more fully develop the record, seek a medical source statement from Dr. Alerte, perform a function-by-function assessment of plaintiff's RFC, and obtain evidence from a vocational expert on jobs available to plaintiff despite his nonexertional limitations.  The Clerk of Court is respectfully directed to enter judgment in accordance with this Memorandum and Order and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
        September 30, 2022

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge

27